1

2

3

4

5

6

7              UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON
                       AT TACOMA
8

9   HATEM M. SHALABI and PYRAMID
    GOLD, INC.,                              CASE NO. C11-505 BHS

10                      Plaintiffs,
                                             ORDER GRANTING
11  v.                                       DEFENDANTS' MOTION FOR
                                             SUMMARY JUDGMENT
12  ATLANTIC RICHFIELD COMPANY, et
    al.,
13
                       Defendants.
14

15         This matter comes before the Court on Defendants Atlantic Richfield Company

16  ("ARCO"), BP Corporation North America, Inc., BP Products North America, Inc., and

17  BP West Coast Products, LLC's ("BPWCP") (collectively "Defendants") motion for

18  summary judgment (Dkt. 49).  The Court has considered the pleadings filed in support of

19  and in opposition to the motion and the remainder of the file and hereby grants the

20  motion for the reasons stated herein.

21

22

# I. PROCEDURAL HISTORY

On March 1, 2011, Plaintiffs Hatem M. Shalabi ("Shalabi") and Pyramid Gold, Inc. ("Pyramid Gold") (collectively "Plaintiffs") filed a complaint against Defendants in the Superior Court of the State of Washington in and for the County of Pierce.  Dkt. 2, Exh. A.  On March 22, 2011, Defendants removed the action to this Court.  Dkt. 1.

On September 19, 2011, Plaintiffs filed an amended complaint against Defendants alleging fraud, fraud in a real estate transaction, and a violation of the Washington Gasoline Dealer Bill of Rights Act, RCW Chapter 19.120.  Dkt. 30.

On August 2, 2012, Defendants filed a motion for summary judgment.  Dkt. 49. On August 21, 2012, Plaintiffs responded.  Dkt. 54.  On August 24, 2012, Defendants replied.  Dkt. 58.  On August 28, 2012, Plaintiffs filed a surreply and requested that the Court strike certain material Defendants submitted with their reply.  Dkt. 64.

# II. FACTUAL BACKGROUND

On October 14, 2004 Pyramid Gold and BPWCP entered into a real estate sales agreement wherein BPWCP was the seller and Pyramid Gold was the buyer.  Dkt. 49, Declaration of Douglas C. Berry ("Berry Decl."), Exh. C ("RESA").  The subject of the RESA was a gas station located at 1440 Puyallup Avenue in an industrial area of Tacoma.  RESA, Exh. A ("Property").

The parties included a provision regarding possible contamination of the Property. The RESA provided that BPWCP would conduct a baseline environmental assessment of the Property, and would be responsible for the cleanup of the Property if the baseline assessment revealed petroleum contaminants in the soil or groundwater that exceeded the

1   reporting and remediation action levels imposed by the Washington Department of

2   Ecology ("WDOE").  *Id*. §§ 12.1, 12.2.  The RESA also provided that Pyramid Gold

3   could "conduct reasonable and customary environmental assessments and tests" of the

4   Property for a period of 45 days.  *Id*. § 12.10(a).  While the RESA contemplated that

5   BPWCP would conduct a baseline assessment of the property, the RESA provided that

6   BPWCP was selling the property "as is" and that Pyramid Gold was buying the Property

7   "solely in reliance on its own investigation."  *Id*. § 13.

8          As contemplated by the RESA, BPWCP hired Delta Environmental Consultants,

9   Inc. ("Delta") to perform a baseline environmental assessment on the Property.  Dkt. 50,

10  Declaration of Matt Miller ("Miller Decl."), ¶ 3.  As part of the assessment Delta drilled

11  four soil borings, collected soil samples, installed ground water monitoring wells, and

12  collected ground water samples.  *Id*. ¶ 4, Ex. B.  Soil and water samples were chemically

13  analyzed by a third-party laboratory.  *Id*., Ex. B. Delta then compiled the results of the

14  testing, and prepared a baseline environmental assessment report.  *Id*. ("BEA Report").

15  The cover letter accompanying the BEA Report provide that

16          This investigation indicated that petroleum hydrocarbons were
        detected in soil samples collected from well borings MW-1 through MW-3
17      above the laboratory reporting limits. Petroleum hydrocarbons were not
        detected in the groundwater sample collected from well MW-2, but were
18      detected above the laboratory reporting limits from the groundwater
        collected from MW-1, MW-3, and MW-4.
19
20  *Id*.  The BEA Report itself details precisely what contamination was discovered, where it

    was discovered, and in what concentrations.  *Id*.; *see also id*. ¶ 6, Tables A-B.
21
    Defendants contend that, while the BEA Report did reveal some contaminants, the
22

ORDER - 3

1  concentration of each detected contaminant was so low that none triggered the most

2  stringent reporting or remediation requirements of Washington's Model Toxics Control

3  Act ("MTCA").  *Id.* ¶¶ 7-8.

4         BPWCP requested that Delta provide Shalabi with two copies of the BEA Report.

5  *Id.*, Ex. D.  On December 9, 2004, Delta hand-delivered two copies of the BEA Report to

6  one of Shalabi's gasoline stations. Miller Decl., ¶ 11.  On December 10, 2004, BPWCP

7  also provided Shalabi with a copy of the BEA report.  Berry Decl., Ex. A (Shalabi Dep. at

8  181-184); *id.*, Ex. H.

9         Because the BEA Report indicated the absence of hydrocarbon contamination

10  requiring any corrective action, the parties entered into a second amendment to the

11  RESA, replacing the entirety of Section 12 of the RESA.  *Id.*, Exh. C (the "Second

12  Amendment").  In the Second Amendment, Pyramid Gold acknowledged that (1) it had

13  been provided with a copy of Delta's BEA Report and (2) BPWCP was making no

14  representation or warranty as to the accuracy of the BEA Report.  *Id.*, §§ 12.2, 12.4.

15  Specifically, the Second Amendment provides in relevant part as follows:

16         12.1 <u>Seller's Environmental Assessment; Definitions.</u>  . . . The
       parties agree and acknowledge that the results contained in the
17     Environmental Report do not disclose the presence on the Real Estate of
       any Pre-Closing Contamination requiring corrective action pursuant to
18     Agency directive.
           12.2 <u>Environmental Reports</u>. Buyer acknowledges that Seller has
19     delivered to Buyer a copy of the Environmental Report . . . .
           12.4 <u>No Representation by Seller</u>. Buyer acknowledges that Seller
20     has not made any representations or warranties regarding the environmental
       condition of the Real Estate, including without limitation any representation
21     or warranty with respect to the accuracy of information included in any
       report or other written document regarding the environmental condition of
22     the Real Estate. . . .

*Id.*

The parties also entered into another agreement titled "Declaration of Environmental Restriction and Other Environmental Covenants and Conditions." Berry Decl., Exh. D ("DER"). Shalabi, as President of Pyramid Gold, signed the DER accepting (1) the property "as is" and (2) that the purchase price reflects "(i) the effect of [the DER] on the Real Estate and (ii) any presence, whether known or unknown, of Pre-Closing Contamination." *Id.* § 3. Shalabi also agreed to a section titled "Waiver of Environmental Claims" that provided a waiver for any claims

> based on or related to the presence of any Hazardous Material on, under, or about the Real Estate at the Effective Date including, without limitation, any claim under the Washington Model Toxics Control Act or any similar statute, whether discovered before or after the Effective Date.

*Id.* § 4.

Defendants contend that Section 12.8 of the Second Addendum was added because Pyramid Gold's lender was concerned that Delta was not able to test under the gasoline island that Pyramid Gold planned to remove within six months of closing as part of its expansion of the pump capacity on the Property. *See* Berry Decl., Ex. L; Berry Decl., Exh. A (Shalabi Dep. at 201-04). To satisfy the lender's concerns, BPWCP agreed to indemnify Pyramid Gold up to $492,000.00 for remediation costs for a period of six months after the closing date if construction revealed any contamination under the old canopy. Second Amendment §12.8.

Following the close of the sale of the Property, Pyramid Gold made its improvements to the Property. It is unknown whether Pyramid Gold conducted any soils

or groundwater testing during this period, but the contractor that did the expansion work,

Joe Hall Construction, Inc., hired a consultant, Environmental Management Services,

LLC ("ESM") to assess groundwater that was removed during construction.  Berry Decl.,

Exh. M (Walker Dep. at 50-54); *Id.* at Exh. N (Spencer Dep. at 5-7). Consistent with the

BEA Report, ESM's testing found that there were no contaminants in the groundwater

above MTCA corrective action levels.  Berry Decl., Exh. N (Spencer Dep. at 7-8); Berry

Decl., Exh. O.  Joe Hall Construction notified Plaintiffs of the results of ESM's testing.

Berry Decl., Ex. M (Walker Dep. at 54).

Almost five years after Pyramid Gold's purchase of the Property, Shalabi entered

into negotiations to sell the Property and neighboring diesel station ("Cardlock Site") to

Marine View Ventures, Inc. ("MVV"), a wholly owned corporation of the Puyallup

Indian Tribe. Berry Decl., Exh. A (Shalabi Dep. at 62-63).  As part of its due diligence

for the proposed sale, MVV enlisted Shaw Environmental, Inc. ("Shaw") to conduct an

investigation into the environmental condition of both the Property and the Cardlock Site.

Berry Decl., Ex. A (Shalabi Dep. at 237).  Plaintiffs contend that Shaw's work revealed

the existence of some contaminants on both properties that exceeded the levels requiring

cleanup under the MTCA, including diesel, petroleum hydrocarbons, heavy oil, and

MTBE.  Berry Decl., Exh. A (Shalabi Dep. at 292, Ex. 235); Berry Decl., Exh. F.

Plaintiffs also contend that the sale to MVV did not go through because of such

contamination.

**III. DISCUSSION**

As a threshold matter, Plaintiffs move to strike certain evidence submitted by Defendants.  Next, Plaintiffs contend that Defendants failed to address the choice of law provision in the RESA.  The Court will address these initial issues and then consider the summary judgment motion.

**A.    Motion to Strike**

Plaintiffs contend that Defendants improperly submitted evidence with their reply brief.  Dkt. 64.  The Court agrees, grants Plaintiffs' motion to strike, and will not accept the evidence while considering the dispositive motion.

**B.    Choice of law**

This Court, sitting in diversity, applies the choice-of-law rules of Washington.  *See Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1005 (9th Cir. 2001).  Under Washington law, when parties dispute choice of law, there must be an actual conflict between the laws or interests of Washington and the laws or interests of another state before the court will engage in a conflict-of-laws analysis.  *Erwin v. Cotter Health Ctrs.*, 161 Wn.2d 676, 692 (2007).  Absent an actual conflict, Washington law applies.  *Id.*

Furthermore, in Washington "a choice of law provision in a contract does not govern tort claims arising out of the contract."  *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 159 (1987).  To determine whether the parties intended the choice-of-law clause to cover the tort claims, the Court must focus on the objective manifestations of their agreement–i.e., "the actual words used"–rather than on the

1    unexpressed subjective intent of the parties.  *Hearst Commc'ns, Inc. v. Seattle Times Co.*,

2    154 Wn.2d 493, 503–504 (2005).

3        In this case, Plaintiffs argue that "the parties have made an express contractual

4    choice of law, which covers the issues in this case."  Dkt. 54.  It appears that Plaintiffs

5    have asserted both contract and tort claims.  With regard to the tort claims, Plaintiffs have

6    failed to show that the parties agreed that California law would cover any such claims.

7    The Agreement expressly states that the "internal laws of the State of California govern

8    this Agreement."  RESA, § G8.  This language does not show any intent by any party that

9    California law would govern any tort claim between the parties.  Therefore, the Court

10   rejects Plaintiffs' choice of law argument as to their tort claims.

11       With regard to the contract claims, Plaintiffs fail to show that there is an actual

12   conflict between the law of California and Washington.  Moreover, Plaintiffs only cite

13   Washington law in support of their positions.  *See* Dkt. 54 at 14–16.  Therefore, the Court

14   rejects Plaintiffs' arguments on this issue because they have failed to meet their burden

15   and implicitly concede that Washington law governs the Agreement.

16   **C.    Summary Judgment**

17       Summary judgment is proper only if the pleadings, the discovery and disclosure

18   materials on file, and any affidavits show that there is no genuine issue as to any material

19   fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

20   The moving party is entitled to judgment as a matter of law when the nonmoving party

21   fails to make a sufficient showing on an essential element of a claim in the case on which

22   the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

1    323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole,

2    could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec.*

3    *Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must

4    present specific, significant probative evidence, not simply "some metaphysical doubt").

5    *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists

6    if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

7    jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc*., 477

8    U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

9    626, 630 (9th Cir. 1987).

10          The determination of the existence of a material fact is often a close question.  The

11   Court must consider the substantive evidentiary burden that the nonmoving party must

12   meet at trial – e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477

13   U.S. at 254; *T.W. Elec. Serv., Inc*., 809 F.2d at 630.  The Court must resolve any factual

14   issues of controversy in favor of the nonmoving party only when the facts specifically

15   attested by that party contradict facts specifically attested by the moving party.  The

16   nonmoving party may not merely state that it will discredit the moving party's evidence

17   at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W.*

18   *Elec. Serv., Inc*., 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory,

19   nonspecific statements in affidavits are not sufficient, and missing facts will not be

20   presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

21          In this case, Defendants move for summary judgment on all of Plaintiffs' claims.

22   The majority of Defendants request that the Court dismiss the claims against them

1   because they are not parties to the Agreement.  The remaining Defendant moves for

2   summary judgment on elements of the fraud and misrepresentation, the elements of the

3   GDBRA, and pursuant to the statute of limitations.

4       **1.      Parties**

5       Defendants ARCO, BP Corporation North America, Inc., and BP Products North

6   America, Inc. move to dismiss Plaintiffs' claims against them because they were not

7   parties to the RESA.  Dkt. 57 at 24.  Plaintiffs' entire response is as follows:

8           BP affiliates are appropriate parties. ARCO was a joint venture in
    the Cardlock facility that was sold to Plaintiffs. (See the Secor Report

9           Exhibit 19, pp. I-1, V-1).

10   Dkt. 54 at 22.  Plaintiffs have completely failed to meet their burden on a motion to

11   dismiss or a motion for summary judgment.  "BP affiliates are appropriate parties" is an

12   unsupported legal conclusion.  With regard to ARCO, Plaintiffs fail to include the

13   "Cardlock facility" in any of their four factual allegations in their complaint (*see* Dkt. 30,

14   ¶¶ 3.1–3.4).  Therefore, the Court grants Defendants' motion as to these parties.

15       **2.      Fraud and Misrepresentation**

16       In Washington, the nine elements of fraud are:

17       (1) representation of an existing fact; (2) materiality of the representation;
    (3) falsity of the representation; (4) the speaker's knowledge of its falsity;

18       (5) the speaker's intent that it be acted upon by the plaintiff; (6) plaintiff's
    ignorance of the falsity; (7) plaintiff's reliance on the truth of the

19       representation; (8) plaintiff's right to rely upon it; and (9) resulting
    damages.

20

21   *Stiley v. Block*, 130 Wn.2d 486, 505–506 (1996).  With the exception of elements four

22   (knowledge) and five (intent), the same basic elements are required for a claim of

1    negligent misrepresentation.  *See Lawyers Title Ins. Co. v. Baik*, 147 Wn.2d 536, 545

2    (2002).

3         In this case, BPWCP argues that Plaintiffs cannot prove reliance, falsity, or

4    resulting damages.  Reliance is justified when it is "reasonable under the surrounding

5    circumstances."  *Id*.  The issue "involves the question of the [relying party's] diligence in

6    ascertaining the facts for himself and his exercise of care and judgment in acting upon

7    representations which run counter to knowledge within his possession or reach."  *Westby*

8    *v. Gorsuch*, 112 Wn. App. 558, 575 (2002) (quoting *Rummer v. Throop*, 38 Wn.2d 624,

9    633 (1951) (internal changes to quotation omitted)).

10        Even viewing the evidence in the light most favorable to Plaintiffs, they have

11   failed to show that reasonable minds could differ on the issue of whether their reliance on

12   any alleged statement of "no contamination" was justified.  This was an arm's length

13   transaction that involved Delta's third party report, which clearly stated that some

14   contamination existed on the Property.  Plaintiffs received the report, Plaintiffs signed

15   documents that referred to the report, and Plaintiffs acknowledged that they were buying

16   the Property "as is" despite the report.  Moreover, Plaintiffs agreed to a provision in the

17   RESA that the Delta report did not disclose any contamination above the corrective level.

18   Second Amendment § 12.1.  Finally, Plaintiffs acknowledged that they were buying the

19   Property "solely in reliance on [their] own investigation."  *Id*. § 13.

20        Plaintiffs' claims are based on the theory that they were ignorant to what the

21   agreements contained, but Washington courts have repeatedly rejected this theory:

22

ORDER - 11

> We have always held that a party whose rights rest upon a written instrument which is plain and unambiguous, and who has read or had the opportunity to read the instrument, cannot claim to have been misled concerning its contents or to be ignorant of what is provided therein.

*Skagit State Bank v. Rasmussen*, 109 Wn.2d 377, 381 (1987) (quoting *Johnston v. Spokane & I.E.R.R.*, 104 Wn. 562, 569 (1919)).  The Court finds that reasonable minds would not differ on the issues of whether (1) Plaintiffs were denied an opportunity to read the RESA or the Delta Report or (2) that Plaintiffs were diligent in ascertaining for themselves any facts regarding the level of contamination on the Property.  Therefore, the Court grants BWPCP's motion on Plaintiffs' fraud and negligent misrepresentation claims.

The Court notes that BWPCP moves for summary judgment on the issues of falsity and damages.  It is not as clear, however, that reasonable minds could not differ on these issues.  Therefore, the Court will not address these issues.

### 3.      GDBRA

BWPCP argues that the GDBRA does not apply to the transaction in question. The Court agrees because the statute clearly conveys that it applies to franchisee-franchiser relationships.  *See* RCW 19.120.101(5) (definition of "motor fuel franchise"). The RESA is not a motor fuel franchise agreement.  Therefore, the Court grants BWPCP's motion on this issue.

1                              **IV. ORDER**

2        Therefore, it is hereby

3        **ORDERED** that Plaintiffs' motion to strike (Dkt. 64) and Defendants' motion for

4 summary judgment (Dkt. 49) are **GRANTED**.  The Clerk is directed to enter

5 **JUDGMENT** for Defendants.

6        Dated this 20th day of September, 2012.

7

8                                 _____

9                                   BENJAMIN H. SETTLE
                                   United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22